# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom Phillip
Joshua D. Uller
Kelly A. Welsh

22 East Mifflin Street
Suite 1000
Madison, Wisconsin  53703

Telephone 608-260-9900
Facsimile 608-260-9901

December 14, 2018

The Honorable William M. Conley
United States District Court Judge
120 North Henry
Madison, Wisconsin 53703

> Re:   *United States v. Matthew Howard*
>        Case No. 17-cr-81-wmc

To the Honorable William M. Conley,

In anticipation of sentencing and in support of a 180-month sentence, the defense submits this sentencing memorandum and attachments, including the sexual evaluation that Howard underwent, a letter from his mother, and one from Mr. Howard.

There's no diminishing Howard's crime and criminal activity. The Court has seen it all and had to evaluate it and has no doubt considered the appropriate punishment that has to accompany it. It would be disingenuous and futile to argue that this doesn't deserve punishment and a lengthy term of incarceration. This Court knows the crime and as a result, I am not going to spend much time on it. Instead, I would like to highlight three factors that militate towards finding that 180 months provides sufficient but not greater than necessary punishment for this offense.

FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.

December 14, 2018
Page -2-

    **1. Matt Howard has a documented history of mental disabilities that relate to his conduct at issue here and the need to punish him.**

This case is, in every sense of the word, tragic. It's tragic for what happened to the victim and for what this has done to the family, but it's also tragic because it shows just how pernicious pornography is on the teenage mind—that's especially so when the person has significant and documented mental disabilities.

Matt was born to a supportive middle-class family. Unfortunately, when he was four, his dad died of a heart attack in their back bedroom—his dad was only 45. Matt was the one that found his dad's body. As if being a widow and a single mom wasn't hard enough, his mom had to deal with Matt's various health problems. It's unclear what contributed to or caused what in Matt's development but there is a general sense that his organic problems were exacerbated by a tragic hospital error when he was a toddler.[1]

The long term impact of that event is, again, not clear. What is certain about Matt is that he's had issues for a long time. He was diagnosed with autism at eight years old. And in the years that followed he's been diagnosed with Tourette's Syndrome, ADD, Depression, Sensory Integration Disorder, and Dyspraxia.[2] The autism and dyspraxia diagnoses are, of course, the big ones. While autism is commonly known, dyspraxia is something I did not know about until this case.

It has been renamed Developmental Coordination Disorder (DCD) in the DSM-5 and is characterized by impaired skills requiring motor coordination. A diagnosis is made if these impairments "significantly interfere(s) with the performance of, or participation in, daily activities in family, social, school, or community life."[3] In reality, for Matt, this has meant difficulty understanding and completing tasks from learning to tie his shoes, to putting thoughts to paper in writing and, of course, his general ability to function in life.[4]

Throughout the records that were gathered in this case by the defense and shared with the government and the probation department, it's very clear that Matt has difficulty relating to peers and is (to be kind) emotionally stunted. One report put it this way:

---

[1] PSR ¶¶ 117, 131

[2] *Id.* ¶¶ 30, 34, 135, 144, 146, 147, 155, 178, 184.

[3] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.

[4] PSR ¶ 136, 138

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

December 14, 2018
Page -3-

> What seems very evident based on testing is that Matthew has profound
> challenges with executive functioning skills to the degree that he does not
> adequately "use" his advanced intellectual abilities to make good choices
> in daily life. While he is quite social, when given a choice, Matthew tends
> to be more impulse and immediate gratification driven. He seems to also
> possess challenges with 'amotivation,' another important function of the
> frontal lobes. In essence, Matthew is likely to perform at a high level if
> others act as his "frontal lobes."[5]

In a word, he needs someone to provide his judgment because he doesn't have that ability
on his own. That point isn't isolated to that report but appears five times in the PSR and
from a variety of sources.[6] He has a hard time completing tasks and he struggles with
many aspects of life—from social interactions to goal setting and executive functioning.[7]
Indeed, his mother's letter speaks about Matt finally finding balance and strength while
training for the military, where the strictures of routine helped him find order.[8]

So the Court is dealing with a person who, when it comes to mental limitations,
has had it rough, suffering an overdose as an infant, which has unknown affects; finding
his dad dead; having a slew of mental disorders, including dyspraxia and autism; and
then on top of all that, as a teen, battling cancer. He was diagnosed with Hodgkin's
lymphoma his senior year in high school. Cancer is always scary and chemo is never easy.
For Matt, who had always struggled in school, it was devastating. He had treatments
during the day, and he would try to make up classes at night school.

Whatever problems his dyspraxia and autism posed were made worse during this
time. He was stuck at home—with little to no social outlet.  He was also dealing with all
the angst that comes with being a teen facing the immense insecurity and uncertainty of
battling cancer. During this time, Matt's mental health also took a turn for the worse. He
became very depressed and started consuming child pornography at a greater and
greater rate, a point spelled out in the PSR.[9]

Against that backdrop, it's helpful to understand how he was introduced to
pornography and child pornography. Matt approximates that he first saw pornographic

---

[5] This report appears at bates 1051 of the documents given to probation and the government.
[6] PSR ¶¶ 128, 138, 152, 157, and 184.
[7] PSR 147, 177, and 184.
[8] Ex. B. at 3.
[9] PSR ¶¶ 50, 122.

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

December 14, 2018
Page -4-

content at age 10. His mom worked a lot and he was socially isolated so he spent a lot of time on the internet playing video games and eventually looking at porn. Around age 16, he was introduced to child pornography. At first, it was girls his age. He's a minor and so it made sense that he liked girls he could relate to—that continued for a while but he still knew that what he was doing was wrong. In 2013, he got his own laptop, exponentially increasing his porn use. This is also when he began hoarding images, of all kinds, including graphic photos—images that he "felt haunted by." PSR ¶ 48.

Matt reports that his porn use was most prevalent when he had cancer and was going through chemo. He began to recognize it as a problem and even took online quizzes, trying to determine if he might have a sex addiction. Still, there was no one he could talk to about his problem. As he reported in the PSR, he thought he could share it with a female friend who was in school for social work, and after he shared, she stopped talking to him. PSR ¶ 50. He says that he was certain that he thought he was going to prison and his inability to share that aspect of his struggles with anyone made his depression all the worse. *Id.* ¶¶ 48–50, The Court can imagine how real the fear and anxiety would be for a young man, especially one with his limitations and inability to process what he was experiencing.

As he got deeper into child pornography, he tried to quit looking at the images, and just swear it all off. *Id.* ¶ 50. And for a season he'd be successful. But when he was stuck at home with the chemo therapy, and with no energy and no other outlet, he turned again to porn and quickly it went back to child pornography. He was still at home undergoing chemo therapy treatment until he was 19. The image at issue in count one was taken in 2014, when Howard was 19. And for the next couple years, Howard's life was a troubling mix of drugs, pornography, and reckless behavior. As the PSR reports, much of his "drug use was tied to hiding or running from these thoughts and the shame he felt." *Id.* ¶ 48. So finding that he was incapable of fitting in with many of his peers, he tried increasingly dangerous behavior as a means of fitting in and coping. *See id.* ¶ 140. Until he found training for the military and finally was "on the right path in life." *Id.* ¶ 51.

I've gone through this history and the behavior that lead up to this crime to highlight this point: Howard's criminal activity (collecting child pornography) started when he was still a minor and while it escalated it was still the product of an immature and impaired mind. Dr. Yachovich's came to the same conclusion: "*Mr. Howard presents a history that seems to be somewhat behind the stage of development congruent with his chronological age. He appears to be psychosocially immature, which is partially due to his impaired cognitive capacity for social and interpersonal skills, as well as the normal delays in maturity that*

FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.

December 14, 2018
Page -5-

*are evident in some adolescent males*. Mr. Howard has experienced a fair amount of trauma and subsequent dysfunction in his young life and his challenges with depleted coping skills and a limited ability to seek and benefit from the support of others, including family, has made many of these events more challenging." Ex. C, p. 5 (emphasis added). His youth, lack of maturity, and impaired judgment and brain development is all something that this Court can and should find as mitigating factors when arriving at a just sentence.

## 2. This is the type of offender, who is amenable to treatment and overcoming his problems with pornography, particularly child pornography.

I want to be clear that Howard's behavior is not explained away through that social history, nor does being 19 or 22 give you a free pass to commit a crime. But when the human brain doesn't mature until 25, and when you have a defendant who today is only 23 and has severe and documented limitations like autism and dyspraxia and who numerous sources say he lacks judgment and needs someone to act as his "frontal lobe," there is a definite sense that this is not "a normal offender." This is the type of offender where there remains hope and an expectation that therapy and structure, coupled with time and maturity will correct his criminal behavior.

This is the second point that the defense has to stress: Howard is not someone who is unrepentant, nor is he someone who doesn't feel that he has a problem and won't seek out treatment. Instead, he fully embraces that fact and his attitude will be a real asset to him in prison and throughout the rest of his life. That attitude shines through in the PSR, Howard's letter, the letter from his mom, and Dr. Yachovich's report. Indeed, one can't help but think that if Howard had been exposed and found treatment at sixteen, none of this would have happened. Instead, he was overwhelmed with guilt and shame for the images he was seeing and kept it all locked inside himself.[10]

Regardless of whether Howard had the right perspective at sixteen, he does now. The PSR reports that Howard has set goals in jail.[11] He has not just stayed fit with a disciplined routine of push-ups—no doubt from his time training for the Army—but he has also sought insight through reading and journaling. And that's reflected in the remorse he feels over his crimes. His words in ¶ 126 are his own and they reflect the hope that he brings to prison and this next stage of his life. It will take a lot of time and therapy and reflection and work for Howard to overcome and in his words "atone" for his

---

[10] PSR ¶¶ 48–50.
[11] *Id.* ¶ 126.

FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.

December 14, 2018
Page -6-

crime.[12] But the point is that Howard is not entering this next fifteen years of incarceration with a feeling of indignation. He embraces that there is a lot of work that he has to do on himself and that comes with being honest with himself.

I also want to be clear that this honesty is not perfectly and cogently expressed in his letter. That's not because Howard doesn't desire to have insight and perspective and express that to his family and the Court; rather, his inability to express it is a product of his disabilities—those with dyspraxia and who are on the autism spectrum often (by nature) lack that ability. You can see that in some of portions of his letter to the Court and how it abruptly breaks into subjects and thoughts. I provide that caveat because after spending a lot of time with Howard over the past 17 months, I realize this: he is better orally expressing himself than he is writing it. The PSR and the medical records support my experience.[13] So I hope the Court will credit more of what he was capable of expressing in the presentence interview than what he wrote to the Court. I know that he struggled with his letter and tried many, many drafts but couldn't make it come together before being okay with this draft. I know that he wanted to authentically express his remorse to his family and his hopes for the future.

The Court, of course, doesn't need to take my word for the fact that he's matured since his arrest and has plans for the future in prison. His mother's letter also speaks to Howard's growth over the past 18 months: "This past year I have also seen him mature to levels I wasn't sure he'd reach during my lifetime. He confided in me, he never paid much attention to the specialists because he didn't think he had disabilities; after being sequestered, he now realizes he does. That, in itself, is a tremendous step forward because now he is receptive to help." Ex. B, p.3. I want to be clear, Mrs. Howard is a truly remarkable person and her commitment and support for Matt has been a beautiful thing to witness. She reads the books that I've assigned to Matt; and she has made sure that he's not just reading the books, but that he's taking the time to understand them and apply their lessons to his life. And those lessons will (I hope) take root and bear much fruit in his life, from being honest about his demons and open to therapy, to becoming a sign language interpreter in prison and an asset and friend to many.

The bottom line is that the facts surrounding Matt and his behavior since his arrest show that he has a true sense of remorse and that he desires and is amenable to treatment. A point that is echoed in Dr. Yachovich's assessment of Howard and his ability to be

---

[12] See Ex. A, p.2.
[13] PSR ¶¶ 126, 138 ("the defendant struggles to translate his thoughts in writing, but typing is easier than actual long-hand writing"), 177, 181, 184 (noting "he needed reading and writing support"),

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.

December 14, 2018
Page -7-

reformed: "Mr. Howard does not fit the profile of one who would likely engage in sexually criminal behavior. He certainly has areas in a variety of behavior and intimacy domains of functioning that require work and an effort on his part for modification. Mr. Howard presents as one very open for to participation in treatment. Mr. Howard is responsible for making grievous errors in judgment related to his current circumstances. *It is the finding of this evaluator that the judgment and behavior involved with the current circumstances are more the product of the impaired functioning that he has displayed much of his life, than criminal or deviant judgment.*"  Ex. C, p. 12 (emphasis added).

That is not to say that his crime isn't terrible or that he doesn't have to be punished, but it does speak directly to the issue of whether he needs a sentence above 180 months. On that point, Dr. Yachovich's report continues on that point: "Mr. Howard presents as a low risk for future offending and as one capable of learning from the errors in his behavior and benefiting from treatment. *The insights and perspectives that he began developing during the most recent stage of his life are indicative of one who portrays an encouraging prognosis for a prosocial lifestyle.*" Ex. C, p. 12.

Lest there be any doubt about Howard's desire to get treatment and deal with these issues that he's struggled with since he was a teenager, this is an email that Dr. Yachovich sent me after he met with Howard:



Re: HowardNick Yackovich to: Joseph Bugni 02/26/2018 08:39 AM

From: Nick Yackovich <yackovichjr@wisc.edu>
To: Joseph Bugni <Joseph_Bugni@fd.org>

Hi Bugs,

I would say that he is very amenable to treatment (I think he would have started the day I saw him, if I would of asked him). He is quite immature, and I think he lacks insight into a number of clinical issues, but these things can be addressed. His maturity will likely improve over the next few years, as he ages. The insight issues can be addressed in treatment, and are more in the general psychological domain than the criminogenic domain. Basically, he has issues that are more of a dysfunctional nature than a deviant nature. Let me know an estimate of when you'd like a completed report, and it's nice to work with you again.

Peace, Nick

Among the many factors that the Court has to weigh in arriving at a sentence is what's the prognosis for change. And here, the Court has every indication that he is the sort of offender who has changed and will continue to change in prison.

FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.

December 14, 2018
Page -8-

### 3.  Just punishment can be accomplished by a sentence of 180 months.

The first two points of this memo center on Howard as a person and the life he had that lead to this crime and his ability to move forward and change. Building on those, the third point that the defense hopes this Court will consider is that 180 months is an appropriate sentence for someone, who has no prior criminal conduct, who has not had the benefit of treatment, and who presents as someone who is not just amenable to treatment but who strongly desires it. The crime here is admittedly terrible and will have long term effects on Howard's family and particularly his sister and niece. There is no denying that.

Yet the issue is whether anything above 180 months provides for any greater benefit in the way of deterrence, incapacitation, or retribution.  When it's honestly considered, a sentence of 181 months will not bring a greater sense of deterrence, safety to the community, or just punishment than a sentence 180 months. In whatever sentence the Court imposes, Howard will be in prison for all of his twenties and the greater part of his thirties. He will miss out on some of the best years that life has to offer. The question is whether there's a compelling need to delay his release into society. The defense submits that there isn't.

After all, a sentence of 180 months is a very significant sentence—in no sense is it a slap on the wrist. It affirms for society that the law does not condone this behavior. It also ensures that Howard gets treatment and that when he rejoins society, the danger he poses is mitigated. That's especially true because when he's released he will have the benefit of sex-offender treatment and the probation office. In sum, when it comes to sentencing Howard nothing more will be accomplished with a sentence of 181 months that isn't accomplished with a sentence of 180 months. And thus, when the Court considers what is a sufficient but not greater than necessary sentence to achieve the goals of sentencing, 180 months is that sentence.

Sincerely,
/ *Joseph A. Bugni*

Joseph A. Bugni
Associate Federal Defender